**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                       Crim. No. 16-01093 MV

PERLYN PERINE,

      Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** is before the Court on Defendant Perlyn Perine's Motion for Suppression of Evidence [Doc. 67], filed February 1, 2019.  The government filed a Response on February 15, 2019 [Doc. 74], and Mr. Perine filed a Reply on March 1, 2019 [Doc. 78].  The Court held an evidentiary hearing on August 16, 2019.  Having reviewed the briefs, testimony, exhibits, and relevant law, for the reasons set forth below, the Court **DENIES** the Motion for Suppression of Evidence.

**PROCEDURAL HISTORY**

On March 23, 2016, an Indictment was returned charging Mr. Perine and his co-defendant with one count of Interference with Interstate Commerce by Robbery and Violence, in violation of 18 U.S.C. § 1951(a), and Aiding and Abetting, in violation of 18 U.S.C. § 2, and one count of Using, Carrying, and Discharging a Firearm in Furtherance of Such Crime, in violation of 18 U.S.C. § 924(c).  Doc. 4.  On July 9, 2019, the government filed a Superseding Indictment, again charging one count of Interference with Interstate Commerce by Robbery and Violence, in violation of 18 U.S.C. § 1951(a) and Aiding and Abetting, and one count of Using, Carrying, and Discharging a Firearm During and in Relation to a Crime of Violence, and Possessing a Firearm in Furtherance of Such Crime, and Discharging Said Firearm, in violation of 18 U.S.C. §

924(c)(1)(A)(iii).  Doc. 89.  Mr. Perine filed the instant Motion for Suppression of Evidence [Doc. 67] on February 1, 2019.  The government filed a Response [Doc. 74] on February 15, 2019, and Mr. Perine filed a Reply [Doc. 78] on March 1, 2019.  On August 16, 2019, the Court held an evidentiary hearing during which it heard testimony from three government witnesses: Officer Jeffrey Bludworth, Detective Denice Myers, and Officer Hector Marquez.

## BACKGROUND

This case concerns the arrest of Perlyn Perine made by law enforcement in a parking lot near Hotel Circle in Albuquerque, New Mexico, as well as the field identification by one of the victims of the robbery.  The following represents the Court's findings of fact, based on the parties' briefing, the testimony of witnesses at the evidentiary hearing on August 16, 2019, and the exhibits.

On November 18, 2015 prior to 11:00 a.m., two men entered a Sprint store located at 2520 Juan Tabo Boulevard NE in Albuquerque.  They approached the counter and pointed firearms at the two employees, forced the employees into the back room at gunpoint, and bound and gagged them with zip ties and duct tape.  Doc. 74 at 1–2.  Video surveillance from the store's security system showed that during this process, one of the robbers inadvertently  discharged his firearm and shot the other in the lower back.  *Id*. at 2.  Doc. 67 at 2.  The men nevertheless continued to pack bags with money, cell phones, and items from the back safe, as well as the employee's personal cell phones, tablets, and a backpack.  Doc. 74 at 2.

One of the employee's iPads had GPS tracking, which allowed for digital monitoring.  Doc. 67 at 2.  Officers with the Albuquerque Police Department (APD) responded to the robbery and spoke to the store clerks, reviewed the surveillance videos, and were able to track the iPad's GPS location to the area of 75 Hotel Circle in Northeast Albuquerque at the Freeway Inn.  Doc. 74 at 2.

Officer Bludworth testified that he was dispatched to help assist in the area of Hotel Circle in an attempt to "locate the subject that robbed the Sprint store." Doc. 104 at 6. At the time he was dispatched, he had received the entire APD call up to that point, was able to listen to the radio, and could view the computer aided dispatch (CAD) on the computer inside his vehicle. *Id*. There were more than ten officers on the call, several of whom were located by the Freeway Inn or around Hotel Circle. *Id*. at 25. Officer Bludworth testified that he was dispatched to locate the suspects, who were described as two black male offenders. *Id*. at 8–9. Initially, the search was based off of information from two 9-1-1 calls, one from the Sprint store and one from an adjacent flower shop. *Id*. at 10. In addition, the GPS tracking showed a location of Campo del Oso and Hotel Circle, near the Freeway Inn. *Id*. at 11. There was a possible photo from the real-time crime center, but several officers including Detective Myers logged onto the call and requested that no photos be shown to any witnesses or front desk staff at the Freeway Inn to preserve the witness information. *Id*. at 14. At 11:25, an officer on the CAD communicated that there were two black male adults on the second floor, and that one black male adult had a shaved head and a dark jacket. *Id*. at 15; Gov. Ex. 2 at 8.

Officer Bludworth testified that at this time between approximately 11:27 and 11:29, the officers at the Freeway Inn were observing these two men matching the descriptions of the suspects as relayed from the officer on-scene at the robbery; this was the same location where the cell phone GPS was pinging, so the officers were starting to hone in on these individuals. Doc. 104 at 17; Gov. Ex. 2 at 8–9. Officer Bludworth arrived at that location at approximately 11:27 a.m. *Id*. at 13. He testified that the officers on-scene at the Freeway Inn were calling out descriptions of the subjects they were observing to the officer who was on-scene at the site of the robbery, Officer Neiberger. *Id*. at 17–18. At 11:29:53, officers on site at the Freeway Inn confirmed a subject

matching the description of the second offender described by Officer Neiberger: a black male adult with a black beanie, black jacket, and rolling a brown luggage bag. *Id*. at 18; Gov. Ex. 2 at 9. Several minutes later, the officers on site observed him "walking gingerly," which was an indication that he was the possible subject of the accidental shooting at the Sprint store. *Id*. at 19. On the CAD, Officer Neiberger reported that the surveillance video showed that the individual was shot on the left side, possibly the lower back or buttock area. Gov. Ex. 2 at 10.

At approximately 11:36 a.m., Officer Bludworth and another officer prepared to make contact with Mr. Perine in front of Babies R Us. *Id*. He testified that Mr. Perine's black jacket was opened at the time he made contact with him. Doc. 104 at 32. He was walking through the Babies R Us parking lot with a suitcase. Doc. 67 at 2. Officer Bludworth reported on the CAD that Mr. Perine was in custody at 11:43:04. Gov. Ex. 2 at 10. This was just over an hour after the time the initial call came in regarding the robbery, at 10:36:51. Doc. 104 at 23. At 11:47, under four minutes after the initial detention, Officer Bludworth relayed that the subject had a blue and gray striped sweatshirt as well as a distinctive necklace, that he matched the description of the suspect, and that he was being detained. Gov. Ex. 2 at 11. He testified that he contacted Mr. Perine, asked him to place his hands behind his back as he detained him, then placed him in handcuffs and patted him down. Doc. 104 at 22. He testified that he placed him in handcuffs because "he was a suspect – or he matched a description of a suspect." *Id*. He also put him in handcuffs because he knew he was potentially armed, and the offense for which he was being detained—robbery—is a violent felony. *Id*.

Officer Bludworth described that he was looking for a suspect in a robbery case at the time he detained Mr. Perine, and he was not looking to help an injured citizen. *Id*. at 30. He placed him in handcuffs right away, and placed him in the patrol car despite Mr. Perine expressing that

he did not want to get in the vehicle. *Id*. He testified that he never told Mr. Perine that he was free to leave. *Id*. He told Mr. Perine to get in the patrol car because it was cold, and when Mr. Perine stated that he was not cold and asked why he was being put in the car, Officer Bludworth told him that he would "explain everything in just a second" and that the car would keep them warm. Gov. Ex. 5.

Officer Bludworth also testified regarding the video taken by his lapel camera, which begins recording once Mr. Perine has already been placed in handcuffs and is being placed in the back of the patrol car. *Id*. at 23. He stated that he did not turn the camera on until midway through his contact with Mr. Perine. *Id*. at 24. He testified that he never informed Mr. Perine that he was under arrest, nor did he read him his *Miranda* rights. *Id*. at 35. He testified that there was a phone that was retrieved from Mr. Perine at the time he was placed in custody, which was on the ground after he was detained but was not with him when he was placed into the vehicle. *Id*. at 30. This phone was described as being taken from Mr. Perine incident to arrest. *Id*. at 31. In the audio from the lapel video, an officer points to some items on the ground after Mr. Perine is handcuffed and asked, "that's your phone?" Gov. Ex. 5. After Mr. Perine answered in the affirmative, the officer again pointed and asked, "that is your phone?" *Id*. Officer Bludworth then asked Mr. Perine about the items on the ground: "is this all your stuff?" *Id*. The Court notes that due to the lapel video beginning mid-interaction, the Court is unable to assess how or why the phone got to be on the ground in the first place.

Officer Bludworth testified that Mr. Perine was not under arrest at the time that he contacted him but rather was being detained for the purpose of "furthering the investigation of the robbery." Doc. 104 at 37. Mr. Perine was not Mirandized until he arrived at the main police

station later on. *Id*. at 54. Detective Myers testified that Mr. Perine never provided a statement to law enforcement, even after he was read his *Miranda* rights. *Id*. at 58–59.

Detective Myers testified that several weeks prior to this incident, she was aware of a string of cell phone store robberies in which iPads and iPhones were taken. *Id*. at 43–44. She stated that they had a general description of "two older black males" who were tying victims up at the scene and leaving with merchandise, but also had descriptions by the victims as well as surveillance videos for most of the robberies that had occurred. *Id*. at 44. On November 18, 2015, she and her sergeant were contacted regarding the Sprint store robbery because the field unit wanted to inform them of a robbery matching a description of a robbery that had occurred several weeks prior. *Id*. Before arriving at the scene, she was able to review a portion of the surveillance video from the back room of the Sprint store, which depicted the offenders removing merchandise from the shelves and tying up the victims, and shows one offender inadvertently discharging his gun into the backside of the other. *Id*. at 45–46. She testified that the individuals in this surveillance video matched the descriptions and resembled the suspects from some of the previous robberies. *Id*. at 48. At that point, she responded to the scene where Mr. Perine had been detained, near Babies R Us. *Id*.

Shortly after Detective Myers arrived on scene, the female victim from the Sprint store was transported to their location for a field identification procedure. *Id*. at 49. Detective Myers testified that at that time, Mr. Perine was wearing the same distinctive shirt and necklace that he was wearing in the surveillance video, and that his appearance at that time did not differ in any way from his appearance in the video. *Id*.

Prior to being transported to the scene, the victim described the suspects' appearance to law enforcement. Over the initial 9-1-1 call, she described the suspects as two black males, both

with guns. Gov. Ex. 7. She described one suspect in his late 40's, approximately 6'2", wearing a blue and blacked striped sweater and black jeans, with prescription tinted glasses with white on the sides. *Id*. She also relayed that the younger suspect shot the older one in the back. *Id*. Sometime after the officers arrived at the scene, Officer Marquez was asked to transport the victim witness to the Babies R Us located on Hotel Circle. Doc. 104 at 63. The officers on site there wanted to determine whether the victim could identify the male who had been detained. *Id*.

Officer Marquez testified that he transported the witness to that location, parked to the west of Babies R Us, and directed the witness that the detained person may or may not be the alleged offender. *Id*. at 64. After they arrived, she positively identified the detained male as the same person involved in the robbery. *Id*. Officer Marquez testified that he did not provide any other instructions and did not in any way indicate that it was the person who had committed the robbery. *Id*. He estimated that they got as close as 15 to 20 feet from Mr. Perine, that the victim's identification was almost immediate, that she seemed very certain about her identification, and that there was no hesitation. *Id*. at 64–65. The Court was not provided a recording of the victim's statement at the time of her identification of Mr. Perine. Officer Marquez did not obtain a written statement from the victim at that time and does not recall otherwise noting her exact words anywhere. *Id*. at 67, 69. He testified that he was trained in methods of identifying suspects and that he did not conduct a "photographic six pack," but that he was not the primary officer so he was not in charge of the investigation. *Id*. at 67–68. He also testified that he and the witness did not have a photograph available for viewing prior to the field identification, but they were listening to the radio call. *Id*. at 68.

Prior to the victim arriving at the scene, Officer Bludworth was asked over the radio to bring Mr. Perine out of the vehicle so that he could be identified. *Id*. at 27. At 12:01:59 and again

at 12:06:24, it was confirmed over the CAD that there was a positive identification of the suspect. Gov. Ex. 2 at 12, 13. Officer Marquez testified that Mr. Perine was surrounded by several officers when they drove by, and that the suspect is usually positioned by the officers so that they are facing the witness and the witness can have a clear visual. Doc. 104 at 70. Detective Myers testified that Mr. Perine was standing by the patrol vehicle when the identification was made. *Id*. at 49. She also testified that there were no other African-American men in the area at the time, and that she believed Mr. Perine was handcuffed. *Id*. at 60.

Officer Bludworth testified that Mr. Perine was not officially in custody and arrested until after they had a positive identification on him. Doc. 104 at 28–29. Detective Myers stated that she was the one who made the determination to arrest Mr. Perine for the robbery; she testified that this decision was made "right when he passed out," which was after the victim identified him at the scene. *Id*. at 51. At 12:03:16, rescue and ambulance were requested and it was communicated over the CAD that Mr. Perine had passed out. *Id*. at 28; Gov. Ex. 2 at 12. Officer Bludworth testified that Mr. Perine passed out in the back of his patrol vehicle, which he believed was due to a gunshot wound. *Id*. at 36. Detective Myers testified that Mr. Perine was standing near the police car when he fainted, and believed that he fell to the ground. *Id*. at 52. She stated that she tried to ask Mr. Perine if he was okay at that time, but there was no response. *Id*. at 50. However, he regained consciousness prior to rescue's arrival at the scene. *Id*. Thereafter, rescue personnel arrived and transported Mr. Perine to the University of New Mexico Hospital on a gurney. *Id*.

## DISCUSSION

### I.      The Arrest

The Fourth Amendment protects an individual's right to be free from unreasonable searches and seizures. *New York v. Payton*, 445 U.S. 573, 584–86 (1980). Accordingly, probable

cause is required for formal arrests or seizures that resemble formal arrests. *United States v. Perdue*, 8 F.3d 1455, 1461 (1993) (citing *Michigan v. Summers*, 452 U.S. 692, 700 (1981)). The Supreme Court in *Terry v. Ohio* adopted an "intermediate approach" based on the fact that officers must sometimes act before probable cause can be determined, and held that a police officer may temporarily detain an individual suspected of criminal activity if the officer is able to point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). Because such detentions must be limited intrusions and should be justified by substantial law enforcement interests, they may be made without probable cause. *Id.* (quoting *Summers*, 452 U.S. at 699). *Terry* stops must be "limited in scope to the justification for the stop." *Id.* Officers may take reasonable steps that are necessary to protect their personal safety and maintain the status quo during a *Terry* stop. *Id.* at 1462 (citing *United States v. Hensley*, 469 U.S. 221, 235 (1985)).

However, if an encounter goes beyond the limits of a *Terry* stop, probable cause or consent will be required. *Id.* (citing *Bignoni-Ponce*, 422 U.S. 873, 881–82 (1975)); *see also United States v. McRae*, 81 F.3d 1528, 1533 (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)) ("an investigative detention must 'last no longer than is necessary to effectuate the purpose of the stop'"); *Lundstrom v. Romero*, 616 F.3d 1108, 1120 (10th Cir. 2010) (citing *United States v. Rodriguez-Rodriguez*, 550 F.3d 1223, 1227 (10th Cir. 2008)) ("If a police-citizen encounter exceeds the limits of an investigative detention, it then becomes an arrest that must be supported by probable cause."). A detention that goes beyond that time period requires consent or that the officer "has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring." *McRae*, 81 F.3d at 1534.

### a. Community Caretaking Exception

Searches outside of the judicial process are per se unreasonable, subject to a few "specifically established and well-delineated exceptions." *United States v. Gilmore*, 776 F.3d 765, 768–69 (10th Cir. 2015) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). The Tenth Circuit has recognized types of police encounters that may be wholly unrelated to investigating or prosecuting crime. *United States v. Garner*, 416 F.3d 1208, 1212 (10th Cir. 2005). One exception recognized by the Supreme Court is the "community caretaking function" as a responsibility of law enforcement that is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)). Under this exception, an officer may seize a person for Fourth Amendment purposes to "ensure the safety of the public and/or the individual regardless of any suspected criminal activity." *Gilmore*, 776 F.3d at 769 (quoting *United States v. King*, 990 F.2d 1552, 1560 (10th Cir. 1993)).

There are several requirements that must be met for a valid detention based on the community caretaking exception. First, similar to any investigative detention, a detention based on the community caretaking function must be based on "'specific and articulable facts which reasonably warrant [an] intrusion' into the individual's liberty." *Garner*, 416 F.3d. at 1213 (quoting *Terry*, 392 U.S. at 21) (citation omitted). Next, the government's interest in detaining the individual must outweigh the individual's interest in being free from arbitrary governmental interference. *Id.* Finally, the detention cannot last longer than is reasonably necessary to effectuate the purpose, and the scope must be "carefully tailored to its underlying justification." *Id.* Once the officer has "completed the inquiry necessary to satisfy the purpose of the initial detention," the individual must be permitted to leave unless there is reasonable suspicion of criminal conduct. *Id.*

(citing *United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir. 1994)).  The Tenth Circuit has also stated that "[t]o ensure community caretaking comports with the Fourth Amendment, we have emphasized officers must first have probable cause to take an individual into protective custody." *Gilmore*, 776 F.3d at 769.

The government argues that in this case, the officers saw a man matching the physical description of one of the robbers, wearing a bright blue striped sweater and a long chain necklace. Doc. 74 at 5.  The officers were aware that one of the suspects had sustained a gunshot wound to the lower back, were aware that both suspects were armed, and noted that the man who they saw walked with a gait that was consistent with an individual who had been shot in the lower body.  *Id*. The government states that the officers began the encounter as a welfare check to determine whether Mr. Perine needed medical attention, but because they were also on the lookout for suspects, they noted that his appearance was consistent with the description of one of the suspects, and felt that under the totality of the circumstances, it was reasonable to detain him in handcuffs for their own safety.  *Id*. at 5–6.

Mr. Perine disputes these facts and states that he was not limping, and that his clothing and jewelry were not visible to the officers because he was wearing a long, buttoned coat.  Doc. 78 at 1.  Furthermore, he states that the CAD report does not establish that the officers approached him for his personal welfare, because he was limping, or because he was injured.  *Id*. at 2.  Noting that an officer's actions must be "totally divorced from the direction, investigation, or acquisition of evidence relating to the violation of a criminal statute" to constitute the community caretaking function, he argues that this exception does not apply because it cannot be pretextual.  *Id*. (quoting *Cady*, 413 U.S. at 441).  He argues that there is no evidence that the officers' decision to approach him was purely based on the caretaking function.  *Id*. at 2–3.

Officer Bludworth testified that the officers conducting the surveillance did indicate that Mr. Perine was walking gingerly on the left side. Doc. 104 at 19, 36. However, the Court finds no evidence in the record to indicate that law enforcement officers contacted Mr. Perine to check on his injury or well-being. Officer Bludworth testified that he contacted Mr. Perine because he was looking for a suspect in a robbery case and not because he was looking to help an injured citizen. *Id*. at 30. He further testified that he placed Mr. Perine in handcuffs immediately, which is not consistent with an officer making contact with a civilian merely for the purpose of determining whether he is in need of medical attention. *Id*. Furthermore, officers did not call for an ambulance or rescue until Mr. Perine had already been detained and handcuffed. Accordingly, the Court finds that the community caretaking exception to the Fourth Amendment does not apply here, and reasonable suspicion would be required for a detention, or probable cause for a formal arrest. *See Garner*, 416 F.3d. at 1213; *Gilmore*, 776 F.3d at 769.

### b. Probable Cause

There is probable cause when, under the totality of the circumstances, there is a reasonable probability that a crime is being committed." *United States v. Traxler*, 477 F.3d 1234, 1247 (10th Cir. 2007) (citing *United States v. Gordon*, 173 F.3d 761, 766 (10th Cir. 1999)). This totality of the circumstances test looks at whether the facts on the whole as observed by law enforcement "indicate a fair probability" that criminal activity is taking or has taken place. *Id*. (quoting *United States v. Concepcion-Ledesma*, 447 F.3d 1307, 1316 (10th Cir. 2006)). Under this test, no single factor or piece of information is determinative. *Id*. (citing *United States v. Johnson*, 364 F.3d 1185, 1192 (10th Cir. 2004)).

The government argues that, based on all of the information known to law enforcement, there was probable cause to arrest Mr. Perine at the time he was apprehended in the parking lot.

Doc. 74 at 6–7.  The government states that law enforcement had the following information at the time they encountered Mr. Perine in the Babies R Us parking lot: a description of the two suspects by the victim witness, security camera footage from the store including surveillance video depicting one suspect shooting the other in the lower backside, the GPS tracking information from the stolen iPad to the location of the Freeway Inn, a man matching the description of one suspect walking with a limp through the parking lot, the location of his gunshot wound, and the positive identification by the victim.  *Id*.

Mr. Perine argues that he had a reasonable expectation of privacy in his bag and in his wound.  Doc. 68 at 4.  He disputes that there was probable cause to arrest him as his coat covered his identifying articles of clothing, as is supported by the CAD.  Doc. 78 at 3.  He also alleges that the officers searched his suitcase at the time of the initial contact.  *Id*.

The testimony at the hearing suggests that Mr. Perine's coat was not covering his clothing prior to law enforcement contacting him.  While, as previously noted, the lapel video does not begin recording until after Mr. Perine was apprehended, Officer Bludworth testified that his jacket was open.  Doc. 104 at 32, 37.  However, according to the CAD printout, the officers on site at the Babies R Us parking lot do not note Mr. Perine's blue and gray striped sweatshirt and distinctive necklace until after he is in custody.  Gov. Ex. 2 at 10–11.  Prior to that time (11:43:04), it is only the officer from the Sprint store who has had the opportunity to view the surveillance video and interview the victim who identifies these identifying articles of clothing on the radio.  *Id*. at 9.  Prior to stating that he is in custody, officers on-scene at the Babies R Us parking lot only indicate a beanie, black jacket, and a brown luggage bag.  *Id*.  Furthermore, the Court notes that law enforcement would not have been able to confirm the existence of a gunshot wound and ascertain the location of such wound as the government suggests until Mr. Perine was already detained.

Additionally, the victim's positive identification of Mr. Perine did not occur for approximately twenty minutes after Mr. Perine was detained, at 12:06:24. *Id*. at 13.

Nevertheless, the Court finds that the officers had sufficient information to find probable cause to arrest Mr. Perine, and further finds that the arrest occurred at the time that he was apprehended and handcuffed. Law enforcement officers were able to trace the GPS ping to the location at Hotel Circle, and they had a description of the offenders from the previous robberies that they were able to match to the surveillance video. They had the initial description by the victim witness from the Sprint store. They were able to observe a man matching the general description of one of the offenders in the area of Hotel Circle, including his approximate size and age and some of his clothing, walking as if he had an injury consistent with that which was observed on the surveillance video, carrying a suitcase through the parking lot. All of this information was being shared over the radio and on the CAD. The Court finds that under a totality of the circumstances there was probable cause to arrest Mr. Perine in the Babies R Us parking lot.

### c.  Miranda

Statements made by an individual in custody or otherwise deprived of his freedom may not be used against him if he has not been properly provided *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966). However, "[i]t is well established that 'police officers are not required to administer *Miranda* warnings to everyone whom they question.'" *United States v. Erving L.*, 147 F.3d 1240, 1246 (10th Cir. 1998) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). Police are only required to provide *Miranda* warnings when individuals are subject to a "custodial interrogation." *United States v. Revels*, 510 F.3d 1269, 1273 (10th Cir. 2007) (citing *Miranda*, 384 U.S. 436). There is a two-part analysis for determining whether an individual must be advised of his or her *Miranda* rights: "(1) the individual must be in custody, and (2) the

individual must be subjected to questioning that meets the legal definition of interrogation." *Id*. (citing *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993)).

A suspect is in "custody" for *Miranda* purposes if the individual has been "deprived of [her] freedom of action in any significant way." *Id*. (citing *Miranda*, 384 U.S. at 444). This deprivation of freedom occurs when the "suspect's freedom of action is curtailed to a 'degree associated with formal arrest." *Id*. (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (citation omitted)). This is an objective standard, based on whether " a reasonable [person] in the suspect's position would have understood [her] situation … as the functional equivalent of formal arrest." *Id*.

The determination of whether an individual is in custody is fact-intensive and based on the totality of the circumstances. *United States v. Jones*, 523 F.3d 1235, 1240 (10th Cir. 2008) (citing *United States v. Griffin*, 7 F.3d 1512, 1516 (10th Cir. 1993)). Courts consider several non-exhaustive factors in this determination. *Id*. First, is "the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview." *Id*. Second, is the "nature of questioning," where "prolonged accusatory questioning is likely to create a coercive environment from which an individual would not feel free to leave." *Id*. Third, is whether the encounter is police-dominated. *Id*. Several factors should be considered to determine whether the atmosphere is police-dominated:

> [S]eparation of the suspect from family or colleagues who could offer moral support; isolation in nonpublic questioning rooms; threatening presence of several officers; display of a weapon by an officer; physical contact with the subject; and an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled.

*Id.* (quoting *Griffin*, 7 F.3d at 1518–19). The Tenth Circuit has emphasized that "context is key" in determining whether an individual is in custody. *United States v. Sanchez-Gallegos*, 412 F.App'x 58, 63 (10th Cir. 2011) (per curiam).

Whether there was an interrogation for purposes of *Miranda* depends on whether there were "any words or actions on the part of the police … that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Perdue*, 8 F.3d at 1465 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). The Supreme Court has held that *Miranda* should not extend so far that "a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." *Oregon v. Elstad*, 470 U.S. 298, 309 (1985).

Mr. Perine argues that the officers' questions regarding whether the phone that was taken from his person belongs to him without *Miranda* warnings is incriminating and should be suppressed as an illegal obtained statement. Doc. 104 at 78. This argument was not brought up directly in the initial Motion [Doc. 67] or addressed in any of the parties' briefs, but rather was brought up for the first time by defense counsel in closing argument at the suppression hearing. However, in the Motion, Mr. Perine argues that the exclusionary rule prohibits the introduction of any tangible evidence seized during an unlawful search, and requests that the Court suppress all evidence seized as a result of the search of his person and all evidence obtained as a result of the search and seizure, including inculpatory statements. Doc. 67 at 6–7 (citing *Murray v. United States*, 487 U.S. 533, 536 (1988)).

It is undisputed that Mr. Perine was not provided *Miranda* warnings at the time he was arrested near Babies R Us. He was not provided *Miranda* warnings until he later arrived at the

police station.  Therefore, the issue is whether the questioning regarding whether the cell phone on the ground near the patrol car belonged to him was considered a "custodial interrogation" such that *Miranda* protections would apply.  Accordingly, the Court must determine (1) whether he was in custody, and (2) whether he was subjected to questioning that meets the legal definition of interrogation.  *See Revels*, 510 F.3d at 1273.

Mr. Perine was in custody if he was deprived of his freedom of action in any significant way, and if his freedom of action was curtailed to a "degree associated with formal arrest."  *Id*. The objective standard asks whether a reasonable person in Mr. Perine's position would have understood that he was in a situation that was the functional equivalent of a formal arrest.  This is a fact-intensive determination based on the totality of the circumstances, including the extent to which the individual is made aware that he is free to refrain from answering questions, the prolonged accusatory nature of the questioning likely to create a coercive environment, and the degree to which the encounter is dominated by police.  *Jones*, 523 F.3d at 1240.

Officer Bludworth testified that upon contacting Mr. Perine, he placed him in handcuffs right away and placed him into the back of the patrol car.  Doc. 104 at 30.  He did so despite Mr. Perine clearly expressing that he did not want to get in the patrol vehicle, stating that he was not bothered by the cold standing outside.  *See* Gov. Ex. 5.  Officer Bludworth also testified that he never told Mr. Perine that he was free to leave.  It is clear from the testimony at the hearing that there were multiple officers in the area of Hotel Circle at the time of Mr. Perine's arrest, including Officer Bludworth, Officer Larry Smith, and later, Detective Myers.  *See* Doc. 104 at 25, 30, 57, 63, 70.  Given that Mr. Perine was isolated in the back of a patrol vehicle in the presence of multiple officers, and that the Court has already determined that he had been arrested at this point, the Court determines that he was in custody for purposes of *Miranda*.

The next question is whether the police questioning him as to whether the cell phone on the ground belonged to him constitutes an interrogation. This depends on whether the police should have known the questions were "reasonably likely to elicit an incriminating response" from Mr. Perine. *Innis*, 446 U.S. 291. Here, two different officers asked three times whether the phone on the ground belonged to Mr. Perine. Because the lapel video began recording midway through the encounter, the Court is unable to ascertain if any questions were asked prior to this point. However, given that the cell phone was seized incident to Mr. Perine's arrest (*see* Doc. 104 at 31), and defense counsel asserts that his admission that the phone belonged to him was incriminating, the Court finds that these questions constitute a legal interrogation. As Detective Myers testified that Mr. Perine never made any statements after he had been Mirandized at a later time (*see id.* at 58–59), this is not a situation where subsequent statements containing the same information would render the initial failure to provide *Miranda* warnings harmless. *See Elstad*, 470 U.S. at 309.

Because Mr. Perine was in custody and he was interrogated, the Court finds that he should have been read his *Miranda* rights prior to any questioning by law enforcement. Accordingly, the cell phone seized incident to his arrest and any evidence derived from that phone will be suppressed.

## II. Search Warrant for the Suitcase

For a warrant to issue, a reviewing magistrate judge must have a "substantial basis for concluding that probable cause existed" based on the totality of the circumstances, meaning that there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Tisdale*, 248 F.3d 964, 970 (10th Cir. 2001) (citing *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)) (citation omitted). It is the defendant's burden to prove the "factual

nexus" between an alleged Fourth Amendment violation and the seizure of evidence sought to be suppressed. *Id.* (citing *King*, 222 F.3d at 1285-86).

Under the attenuation doctrine, evidence is admissible when "the connection between the unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Utah v. Strieff*, 136 S.Ct. 2015, 2061 (2016).

Mr. Perine argues that he had a reasonable expectation of privacy in his bag and alleges that the officers searched it at the time of the initial contact. Docs. 67 at 4, 78 at 3. He argues that the exclusionary rule prohibits the introduction of tangible evidence seized during an unlawful search. Doc. 67 at 6 (citing *Murray*, 487 U.S. at 536). He also argues that derivative "fruit of the poisonous tree" evidence is also prohibited. *Id.* (citing *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)). He therefore requests the suppression of all evidence seized as the result of the search of his person as well as any evidence obtained as a result of the illegal search and seizure that he alleges took place. *Id.* at 7.

The government argues that evidence is admissible if it is remote from the alleged unconstitutional police conduct or it has been interrupted by an intervening circumstance, so that the interest in protecting constitutional rights would not be served by the suppression of evidence. Doc. 74 at 8 (citing *Strieff*, 136 S.Ct. at 2061). The government argues that even assuming, arguendo, that the arrest was not based on probable cause, nothing from Mr. Perine's arrest led to the discovery of the stolen merchandise in the suitcase because the suitcase was not searched until a valid search warrant was obtained, and there was sufficient evidence to support probable cause for the search warrant independent of Mr. Perine's arrest. *Id.* at 9.

This topic was not substantially addressed at the hearing. However, the government provided the affidavit for the search warrant, where Detective Myers described the suitcase and the items expected to be found within, including firearms and related items, clothing containing DNA evidence, and items connected to the robberies such as cash, iPads, duct tape, zip ties, camera surveillance equipment, and cellular phones. Gov. Ex. 1 [Doc. 74-1 at 1–2]. Detective Myers included in the affidavit numerous facts regarding the suspects and the robberies, including a description of Mr. Perine's appearance, the possible gunshot wound, and the positive identification in the field following his apprehension. *Id*. at 3. The items seized from the suitcase following the execution of the search warrant include several iPhone 6S's, Sprint business cards, an iPad, a speaker, and phone cases, among other items. *Id*. at 6. Officer Bludworth testified that he did not search the bag that Mr. Perine had on him when he was detained. Doc. 104 at 37. Detective Myers testified that she drafted and executed the search warrant, and that the bag was not searched prior to obtaining the search warrant. *Id*. at 59.

The Court finds that there was probable cause for the search warrant to issue and that the magistrate judge had a substantial basis for concluding that there was probable cause. Having found that probable cause existed for Mr. Perine's arrest, there was no unconstitutional evidence or information upon which the search warrant was issued. Therefore, the suitcase and the contents therein will not be suppressed.

### III. Field Identification Procedure

To determine whether a due process violation occurred during an identification procedure, there is a two-pronged inquiry. *United States v. Bredy*, 209 F.3d 1193, 1195 (10th Cir. 2000). First, the Court should examine whether the procedure was unnecessarily suggestive. *Id*. (citations omitted). It is only necessary to reach the second prong if the Court finds that the procedure was

unnecessarily suggestive. If so, the question is whether, under the totality of the circumstances, the identification was reliable despite the suggestiveness of the confrontation procedure. *Id.* (citing *Neil v. Biggers*, 409 U.S. 188, 199 (1972)). In other words, the question is whether, under the totality of the circumstances, the suggestive show-up "created a substantial likelihood of misidentification." *Id.* (quoting *United States v. Thody*, 978 F.2d 625, 629 (10th Cir. 1992)). There is no due process violation so long as the procedure is not "so unnecessarily suggestive that it is 'conducive to irreparable mistaken identification.'" *Id.* (citations omitted).

The Supreme Court has described the reliability prong as the "linchpin" question for determining whether identification testimony is admissible. *Id.* (citing *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)). There are five factors that are used to evaluate the reliability of an identification:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.* at 1195–96 (citing *Neil*, 409 U.S. at 199-200).

Mr. Perine argues that the cross-racial identification in this case was not reliable because no precautions were used to protect against misidentification, such as the use of sequential photos. Doc. 67 at 5. He argues that a Hispanic/Caucasian female employee of the Sprint store was brought to the scene where he, a black man, was handcuffed and was either standing near a police car or sitting in the back of the car. *Id.* at 6. Accordingly, he argues that this identification should be excluded based on how suggestive it is. *Id.*

The government argues that the show-up procedure was not unnecessarily suggestive because the officers, per their field investigation policy, transported the victim to the scene of the arrest to make the identification. Doc. 74 at 11 The procedure was "necessary and justified"

according to the government because otherwise, the officers would not have known if they were detaining the right person. *Id*. at 11–12. The government also argues that law enforcement needed to act quickly because of Mr. Perine's need for medical attention, and noted that the show-up procedure took place within an hour and a half of the robbery. *Id*. at 12. Furthermore, the government maintains that the procedure was not unnecessarily suggestive because the police did not relate to the victim any facts linking Mr. Perine to the robbery, the victim did not express any doubt in identifying Mr. Perine, the police did not encourage the identification, and only a short period of time had elapsed since the robbery. *Id*. Even if the show-up procedure was unnecessarily suggestive, the government maintains that the five *Bredy* factors still weigh in favor of reliability. *Id*.

In his Reply brief, Mr. Perine maintains that the identification was unnecessarily suggestive because the victim observed him while he was handcuffed and surrounded by officers. Doc. 78 at 4. He did not address any of the reliability factors in his brief.

Officer Marquez testified that Mr. Perine was surrounded by several officers when they drove by, and that the suspect is generally positioned by officers so that they are facing the witness. Doc. 104 at 70. Detective Myers testified that Mr. Perine was standing by the patrol vehicle during the show-up, that he was handcuffed, and that there were no other African-American men in the area. *Id*. at 49, 60. The Court finds these circumstances to be unnecessarily suggestive under the first prong of the *Bredy* test.

The next question is whether, under the totality of the circumstances, the suggestive show-up is nevertheless reliable, or whether it created a substantial likelihood of misidentification. *Bredy*, 209 F.3d at 1195. To make this determination, the Court must evaluate the five reliability factors. *Id*. at 1195–96. First, the court finds that the witness had ample opportunity to view Mr.

Perine closely at the time of the crime. Based on the surveillance video, she was able to view him clearly as he was several feet in front of her, including his identifying articles of clothing, his demeanor, his height and size, and his race and general appearance. Gov. Ex. 6. Second, the victim appeared calm in the video and was able to recall numerous descriptive details after the incident, and later relayed them to the 9-1-1 operator. *Id*.; Gov. Ex. 7. Third, her description of him on the 9-1-1 call was accurate and detailed under the circumstances. *Id*. Fourth, Officer Marquez testified that at the show up, the victim's positive identification was almost immediate, she did not hesitate or show any uncertainty, and they were approximately 15 to 20 feet from Mr. Perine as they drove by. Doc. 104 at 64–65. Finally, the identification took place approximately one and one half hours after the initial call came in regarding the robbery. The CAD indicates that the initial call came in at 10:36:51 a.m. and the positive identification was logged at 12:06:11 p.m. Gov. Ex. 2 at 1, 13.

Therefore, while the Court does find that the show-up procedure was unduly suggestive, the *Bredy* factors indicate that the identification was nonetheless reliable. Accordingly, the identification evidence does not amount to a due process violation under the *Bredy* test, and the identification evidence is admissible.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant Perlyn Perine's Motion for Suppression of Evidence [Doc.67]. However, the Court finds that his admission of ownership of the cell phone on the ground at the time of his arrest, without having been advised of his *Miranda* rights, shall be suppressed, as will any evidence obtained from that cell phone.

Dated this 5th day of September, 2019.

_____
MARTHA VAZQUEZ
UNITED STATES DISTRICT JUDGE


Irma Rivas                                    Presiliano Torrez, Timothy Trembley
*Attorney for Mr. Perine*                    *Assistant United States Attorneys*